IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Russell McElhinney,<br>              Plaintiff, | ) | No. CV 07-212-TUC-DCB (HCE) |
| | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| vs. | ) | |
| | ) | |
| | ) | |
| Michael J. Astrue, Commissioner of<br>Social Security, | ) | |
| | ) | |
| | ) | |
|              Defendant. | ) | |
| | ) | |
| | ) | |

On May 7, 2007, Plaintiff filed the instant action seeking review of the final decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g).   On that same date, Plaintiff's case was referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to the Rules of Practice of this Court.

On November 20, 2007, Plaintiff filed a Motion for Summary Judgment (Doc. No. 20) (hereinafter "Plaintiff's MSJ"). On February 29, 2008,  Defendant filed a Cross-Motion for Summary Judgment (Doc. Nos. 30,   32) (hereinafter "Defendant's XMSJ"[1]). For the following reasons, the Magistrate Judge recommends that the District Court grant in part and

---

[1]Citation herein to Defendant's XMSJ refers to "Defendant's Memorandum in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment" (Doc. No. 32).

deny in part Plaintiff's MSJ, deny Defendant's XMSJ, and remand this matter for further proceedings.

I.    PROCEDURAL HISTORY

On September 17, 2004, Plaintiff protectively submitted to the Social Security Administration (hereinafter "SSA") an application for disability insurance benefits under Title XVIII of the Social Security Act alleging inability to work since January 1, 2004, due to "severe asthma/lung damage/breathing problems" and chronic obstructive pulmonary disease (hereinafter "COPD").  (TR. 81, 93)  Plaintiff's application was denied initially and on reconsideration. (TR. 58-62, 68-70)

Plaintiff then requested a hearing before an administrative law judge and the matter was heard on February 23, 2006 by ALJ Milan M. Dostal  (hereinafter "the ALJ"). (TR. 17, 56, 432-459)  On September 22, 2006, the ALJ denied Plaintiff's claim.  (TR. 17-29) On April 6, 2007, the Appeals Council denied Plaintiff's request for review thereby rendering the ALJ's September 22, 2006  decision the final decision of the Commissioner.  (TR. 4-6, 11)  Plaintiff then initiated the instant action.

II.    THE RECORD ON APPEAL

A.    Plaintiff's general background and Plaintiff's statements in the record

Plaintiff was born on March 15, 1946 and was 60 years old on the date the ALJ issued his decision.  (TR. 81; Defendant's Statement of Facts, (Doc. No. 31) p.2)  Plaintiff is married.  (TR. 81, 442) He does not have any children under the age of 18.  (TR. 82)

Plaintiff completed school through the ninth grade and does not have a GED certificate. (TR. 436) Plaintiff's work history includes employment as an "owner/operator" of a music business from June 2002 to August 2004; a "parts man" for a metal fabrication business from 1988 to January 2002[2]; and an automobile salesman from April 2002 to June

_____

[2]This employment included working as a welder and frequently required lifting of 50 pounds or more.  (TR. 95, 451)

2002. (TR. 100; *see also* TR. 449-453) Plaintiff testified that he last worked in the music and entertainment field "for a couple of years." (TR. 450) He played guitar and sang with his wife usually every other night. (TR. 449-450) They typically played at resort areas, churches and county fairs. (TR. 450) They last worked three or four times between January and August 2004. (TR. 453)

Plaintiff developed asthma and bronchial problems while he was working "in a welding shop...." (TR. 451) At times the shop would be so smoky that "you couldn't even see from [sic] end of the shop to the other." (Id.)

Plaintiff testified that he uses an Albuterol inhaler about several times a day. (TR. 437) He uses a nebulizer daily about every four hours. (Id.) Cold air, humidity, and chemicals affect Plaintiff's asthma. (TR. 437-438) Plaintiff coughs a lot when there is cold weather[3] or chemicals and when he is talking or singing a lot. (TR. 445) Fifty per cent of the time Plaintiff has good days and the other fifty per cent, he has bad days. (TR. 445-446)

Plaintiff also experiences constant back pain in the lower part of his neck, between his shoulder blades, over his shoulders, and down his arms. (TR. 438) To treat back pain, Plaintiff takes approximately three Vicodin a day and, at times, uses a home traction device. (TR. 438-439) At night he takes Arazapan for pain. (TR. 439) Plaintiff testified that he does not experience side effects from the Vicodin or Arazapan. (TR. 444)

For the past ten years, Plaintiff has used eye drops for glaucoma. (TR. 439-440) "[T]he pressure is pretty well stabilized." (TR. 440)

Plaintiff is also borderline diabetic. (TR. 440)

About one and one half years before the hearing, Plaintiff suffered a torn ligament in his left leg above the knee. (TR. 440) "[I]t bothers me a lot if I walk a lot on it. It's getting

---

[3]Plaintiff moved to Arizona from Idaho "to get away from the cold winters." (TR. 438)

better."  (Id.)  Plaintiff uses a cane for support and balance because his legs gives away.[4] (TR. 445) No doctor prescribed the cane.  (Id.)  Plaintiff can walk "probably a quarter mile." (TR. 441) However, if his asthma is bothering him, he can walk only a couple of blocks. (TR. 445)

Plaintiff suffers from acid reflux for which he takes Prilosec. (TR. 441) He also has sinus problems and, twelve to thirteen years ago, he underwent  five sinus surgeries.  (Id.)

Plaintiff "smoked about 8 years ago.  I quit and I did a couple of days for about 4 months ago.  And then I been [sic] quit again for 2 months now.  Couldn't handle it."  (Id.)

Plaintiff's breathing problems make it difficult for him to sleep.  (TR. 444) He sleeps with his head elevated four inches.  (Id.)

Plaintiff has some hearing loss in both ears and wears hearing aids.  (TR. 446) He has difficulty distinguishing words.  (Id.; *see also* (TR. 133) ("I have a hard time understanding and hearing.")  He especially has hearing difficulty during telephone conversations.  (TR. 446-447)

Plaintiff and his wife live in a motor home near his daughter.  (TR. 442) "[O]nce in a while...", he babysits his grandchildren aged 2 ½, 8 and 13, by sitting "down and watching TV with them."  (Id.)  "[S]ome days I lay on the couch and recuperate...I'm not exaggerating. When I'm having problems breathing, I go on the [n]ebulizer.  Other days, we used to do music and I will work on playing guitar and would go to nursing homes when I can and do a few songs.  I mean, there it doesn't matter whether you cancel out or not."  (Id.)  Plaintiff's wife sings as well.  (Id.)  They perform at nursing homes about twice a month.  (TR. 442-443) They no longer use "a trailer full of equipment" but instead use a plug-in amplifier which weighs approximately 50 pounds to carry.  (TR. 443) Plaintiff uses a cart to move the

---

[4]Plaintiff stated in his November 2004 Function Report that he uses a cane to walk because of an injured hip.  (TR. 134)

amplifier. (Id.)  Sometimes, in place of the amplifier, they use "a little karaoke thing" which weighs about 6 or 7 pounds.  (Id.)

On a typical day, Plaintiff rises at 7:00 a.m., makes coffee, watches the news, goes to the Post Office, plays solitaire, listens to music, and naps.  (TR. 128) Approximately twice a week, he assists with meals by grilling meat out doors for about 20 minutes.  (TR. 130) He washes dishes, takes the trash out, and does light household repairs.  (Id.)  Approximately twice a week, he also goes grocery shopping with his wife.  (TR. 131) He drives a car and motorcycle.  (Id.)  He attends church on a regular basis although he has attended less and sometimes has to leave early due to difficulty breathing.  (TR. 132-133) Plaintiff goes camping once or twice a year.  (TR. 132) His activities vary according to his ability to breathe.  (TR. 128)

Plaintiff's illness has affected his ability to perform physical labor, repair vehicles, sing, lift and set up music equipment, and walk.  (TR. 135; *see also* (TR. 145 ("The decrease in air flo [sic] into lungs prohibits my breathing and energy levels.  This makes my capacity to lift and carry music equipment not in the normal range.  When these jobs were done my air flo [sic] levels were down to abnormal range for me to function in a capacity to sing during performance dates, adequately.  Body levels took 2-3 days to even get back up in a range to function normally..."))  Plaintiff has had to discontinue musical performances, mowing the lawn, and mechanical work because of breathing problems. (TR. 132) Plaintiff has difficulty lifting, bending, standing, walking, climbing stairs, completing tasks, and concentrating.  (TR. 133; *see also* (TR. 135) ("completing tasks and concentrating, interrupted constantly by coughing and shortness of breath (time may vary) 45 minutes."))  He can only lift 20 pounds, stand no longer than 20 minutes at a time without resting, walk 3 to 4 city blocks without resting.  (TR. 133)

He has difficulty bending to put on his shoes and socks because bending cuts off his airway.  (TR. 129) He also has difficulty bathing which requires reaching in different directions.  (Id.)

- 5 -

Plaintiff's illnesses cause lack of stamina.  (TR. 117) He tires easily and things take longer for him to do.  (Id.)

B.      Medical Evidence

       1.      Plaintiff's Treating Physicians

              a.      Asthma, Diabetes, Hernia, and Gastroesophageal Reflux Disease (hereinafter "GERD")

In March 1987, while Plaintiff was living in Idaho, Plaintiff saw Gregory Kadleg, M.D., on referral from an ear-nose-throat specialist.  (TR. 165-168) At that time, Plaintiff was working as a welder and smoked one and one-half packages of cigarettes daily.  (TR. 166) Plaintiff exhibited asthma and sinusitis.  (TR. 167) During the course of Dr. Kadleg's treatment, which appeared to consist of monthly visits from March 1987 through July 1987, Plaintiff underwent surgery for sinusitis performed by another doctor.  (Id.)  Dr. Kadleg continued to see Plaintiff for asthma treatment.  (TR. 168)   When Plaintiff first saw Dr. Kadleg in March of 1987, Plaintiff was coughing and "[h]is nose had a marked allergic appearance with much post-nasal drainage."  (TR. 166) Physical examination of Plaintiff's chest revealed "expiratory wheezing.  His spirometry demonstrated a peak flow of 75% predicted; vital capacity, 83% predicted; FEV1, 81% predicted; and FEF 25-75, 72% predicted.  He was taking bronchodilators at that time."  (Id.)   In July 1987, Plaintiff's medications included Medrol, TAO, Medi-Mist with Proventil plus Intal, Azmacort, Nasalide, Theo-Dur, and Atrovent.  (TR. 168) Dr. Kedlag stated that Plaintiff

> is definitely incapacitated with his asthma and should live in a clean environment.  I have urged him to continue on the medications...and we will try to decrease his dose of steroids so  that he will be at 10 mg. of Medrol...In summary, I believe that this man absolutely cannot work in a dusty environment.  He has pansinusitis which continues to exacerbate his asthma, as well as the dusty environment continues to exacerbate his sinusitis and asthma.  He takes an enormous amount of medication and needs to do so.  He is simply unable to work in an unclean atmosphere.

(TR. 168) Dr. Kedlag opined that with training Plaintiff would be able to do other work "such as drafting, indoor mechanical repair work, etc.  I believe his prognosis is good if he

is trained to work in a clean environment.  I believe his prognosis is absolutely terrible if he

has to continue working in a dusty or dirty environment, especially the type of work he does

now which is welding with unavoidable exposure to dust, mold, etc." (Id.)

In September 1987, Dr. Kedlag wrote in a letter to a vocational rehabilitation

representative that Plaintiff suffered from "extremely severe rhinosinusitis and severe

asthma." (TR. 165) He stated that it would be beneficial for plaintiff to "work in a clean

environment." (Id.) Dr. Kedlag defined a "clean environment" as one "that is indoors,

presumably air conditioned or equipped with some type of air filtration system so that he is

exposed to very small amounts of dust." (Id.)

A January 2002, examination by Rebecca Goldsmith, Physician Assistant, denoted

that Plaintiff was breathing easily, had normal resonance, and good air movement. (TR. 230)

Her assessment included hypertension, hyperlipidemia, GERD which was stable,

osteoarthritis involving the spine, allergic rhinitis which was stable. (Id.) In August 2002

and October 2003, P.A. Goldsmith also noted Plaintiff was breathing easily, had normal

resonance, and good air movement. (TR. 218-219, 226-227)

In April 2004, Plaintiff presented to PA Goldsmith for treatment for periodic

wheezing and shortness of breath.  He reported that he "[q]uit smoking in 1997 after a 25 pk-

yr smoking..." history. (TR. 265) Plaintiff stated that "[h]e went through a period from mid

1990s to the last year where he was not having difficulty and was not using any MDIs.  He

would like to get more inhaler. [sic]" (Id.) Although he reported he was "fine at rest," he

experienced shortness of breath with modest exertion and extreme shortness of breath with

heavy exertion such as that required for loading equipment. (Id.) An April 2004, Radiology

Report regarding views of Plaintiff's chest reflected no acute cardiopulmonary process. (TR.

264) A June 2004 spirometry revealed that diffusing capacity was mildly reduced. (TR. 257

(also indicating "mild restriction")).  In June 2004, PA Goldsmith reported that a pulmonary

function test was abnormal reflecting low "DLCO and flows, not much response to

bronchodilator." (TR. 268) She also noted that Plaintiff's "resting sat was 96% but decreased

to 89% with walking around, minimal wheezing with forced FVC at that time."  (Id.)  Her assessment was that Plaintiff's pulmonary function tests "and response to BP" were not compatible with previous diagnosis of asthma.  (Id.)  She recommended a chest CT to rule out pulmonary disease.  (Id.)

A July 2, 2004 high resolution chest CT showed no evidence of interstitial lung disease; "nonspecific small nodules in the left upper lobe, likely benign granulomata; and bronchial wall thickening consistent with bronchitis.  (TR. 270-271) A note of Plaintiff's conversation with John W. Shigeoka, M.D.[5], on July 2, 2004 reflected that the "[c]onclusion is that patient does have underlying emphysema and overall physical deconditioning.  Plan is to have patient do graduated exercise program and follow-up in clinic."  (TR. 270)

An August 25, 2004  chest CT showed no visible change from the July 2004 study. (TR. 260; 176-175) There was no evidence of interstitial lung disease.  (Id.)  There were "scattered small calcified nodules, consistent with remote benign granulomatous disease." (TR. 261)

In September 2004, Plaintiff complained to PA Goldsmith about continued episodic shortness of breath. (TR. 201-204) He reported that triggers included the smell of freshly cut grass or hay, musty odors, perfumes, paint, ammonia, fingernail polish and other chemical smells.  (TR. 201) He also reported "an exertional component."  (Id.)  Inhalers and rest relieved symptoms.  (Id.)  He also stated that because he is unable to set up equipment or sing, he has had to shut down his music group and file for disability.  (Id.)  PA Goldsmith's assessment was asthma, hyperlipidemia, hypertension, GERD, and osteoarthritis involving the spine.  (TR. 204)

In October 2004, Plaintiff presented to Christopher Rich, M.D., complaining of "worsening dyspnea since [J]anuary of this year...any kind of labor, walking, etc resulted in

---

[5]Records identify Dr. Shigeoka as Chief of the Pulmonary Section for Veteran's Services, "Salt Lake City HCS."  (TR. 329)

dyspnea and it would take him several hours to recover. [S]ince then, [symptoms] have progressed and he has dyspnea and dry cough with exertion, cold air, fresh grass, smoke, dust, wind, paint fumes. [H]e also has some chest tightness with these triggers...he does endorse some hoarseness when singing." (TR. 281) Plaintiff also complained of chest tightness at times. (Id.) Dr. Rich's impression was that Plaintiff had "profound, work limiting [symptoms] but pulmonary eval thus far does not show significant gas exchange abnormalities that would suggest a lung parenchymal disease. [H]e may have some component of underlying asthma, but the severity of his [symptoms] is not borne out by the relatively unremarkable p[ulmonary] f[unction] t[ests] and imaging." (TR. 281-282) Plaintiff was scheduled for evaluation by an ear, nose, and throat doctor to rule out central airway obstruction and such examination took place on November 1, 2004 performed by Becky Massey, M.D. (TR. 277-279, 282) Dr. Massey noted Plaintiff's complaints of attacks of shortness of breath, difficulty inspiring air, and chest tightening during these incidents. (TR. 277) She also noted Plaintiff's previous pulmonary function tests showed no response to bronchodilators. (TR. 277) She observed that Plaintiff stopped speaking mid-sentence to take a breath. (TR. 278) Dr. Massey's examination revealed no central airway obstruction. (TR. 278) She opined that reflux "could be another thing affecting his symptoms." (Id.) She recommended breathing techniques for use during Plaintiff's "next attack." (Id.) Plaintiff continued with asthma medication. (Id.)

Records from January 18, 2005, reflect that Plaintiff saw Maylinda Reeves, M.D. and Jamile Woods M.D. (TR. 190-191) A spirometry done that date showed "some obstructive component with significant bronchodilator response which is consistent with asthma." (TR. 190) Plaintiff's medications were adjusted "[f]or better control of his symptom..." (Id.) Upon a January 19, 2005 physical examination, PA Goldsmith noted that Plaintiff's breathing was slightly labored, normal resonance, "few inspiratory and scattered expiratory wheezes with fair and equal air movement to bases." (TR. 188) Her assessment was asthma, hyperlipidemia, hypertension, GERD, osteoarthritis involving spine, allergic rhinitis,

glaucoma, and insomnia.  (Id.) As of  January  19, 2005 Plaintiff was taking the following medications:  Albuterol  solution for a nebulizer as well as an inhaler for asthma, Sodium Chloride for use with the nebulizer, cough syrup with Codeine and Guaifenesin, Prednisone "for breathing", Fluticas inhalant disk, HCTZ/Triamterene for blood pressure, Hydrocodone with Acetaminophen for lower back pain, Montelukast for asthma, Flunisolide nasal spray, Omeprazole "for stomach (should help asthma)", Alprazolam to help with sleep and anxiety, Brimonidine Tartrate and Travoprost for eyes, Ranitidine to reduce  stomach  acid,  and Simvastatin to lower cholesterol.  (TR. 186-187)

On April 21, 2005, Plaintiff presented to the pulmonary clinic for follow up where he saw Stacy Smith, M.D., and Dr. Shigeoka.  (TR. 328-329) Plaintiff's "flow meter records have shown him to be in the low 300's pretreatment and up to high 300's or low 400's post" treatment.  (TR. 328) Prior to the January 2005 change in medication, Plaintiff could only sing about half a song "and now can sing about 2 ½ before he becomes" short of breath.  (Id.) Plaintiff stated that he still experienced "some limited physical activity due to dyspnea and can only walk about 2 ½ blocks."  (Id.)  He was considering moving to Arizona for his health.  (Id.)  "Overall...[Plaintiff] notices a marked improvement on Advair and albuterol, also improvement of his reflux on omeprazole."  (Id.)  Assessment included "continued symptoms of cough and dyspnea, bound by spirometery [sic] to have obstructive component with significant bronchodilater [sic] response consistent with asthma, improved since last visit.  Pt. also has calcified nodules on CT, unknown significance."  (TR. 329) He was continued on Advair, Albuterol, Singulair, Omeprazole, Flunisolide, and Predisone.  (Id.)

In July 2005, Plaintiff reported to PA Goldsmith that he was using his "rescue inhalers 3-4 times a day for the past several months."  (TR. 355) He also stated that he was suffering due to nearby fires and smoke.  (Id.)  His coughing exacerbated disk disease in his neck. (Id.)  Earlier, he had been instructed to raise the head of his bed but was unable to do so because he lived in a trailer and the bed was bolted to the floor.  (Id.)  He also complained about difficulty swallowing solids which has grown worse over the last few months.  (TR.

355-356) PA Goldsmith noted on examination that Plaintiff was able to speak in full sentences and that his voice was hoarse.  (TR. 357) She assessed "severe/moderate persistent asthma by symptoms with exacerbation due to pollution."  (Id.)  She noted Plaintiff was going to be moving to Arizona and she reviewed GERD control information and medications with Plaintiff.  (Id.)

In August 2005, Plaintiff underwent "cookie swallow" testing for complaints that while eating, his airway occasionally closed rendering him unable to breathe.  (TR. 352) Test results denoted "[n]o evidence of aspiration or penetration with all textures in all amounts. Noted moderate pooling in the valleculae that spilled to the pyriform sinuses which then cleared with a spontaneous second swallow."  (Id.)  No treatment was recommended.  (Id.)

In December 2005, Plaintiff saw Roberta J. Bowdish, Nurse Practitioner (hereinafter "NP"), when he sought treatment at the Veteran's Affairs in Arizona regarding his history of asthma since childhood, hypertension, glaucoma in both eyes, chronic cervical and lumbar back pain, right inguinal hernia, hyperlipidemia, hyperglycemia, GERD, bilateral hearing loss, and mild depression due to history of blue moods and difficulty sleeping.  (TR. 314, 317; *see also* Plaintiff's MSJ, p.2) He reported that he had been smoking a "varying" amount but that he had "quit again a week ago..."  (TR. 315) NP Bowdish decided not to change Plaintiff's medical regimen with regard to his asthma because he was "doing fairly well at this time..."  (TR. 316) She recommended that Plaintiff "continue efforts to remain off tobacco–consider use of zyban in future."  (TR. 317)  With regard to Plaintiff's other complaints, she ordered further testing and prescribed various medications.  (TR. 316)

A December 8, 2005 note reflects that NP Bowdish informed Plaintiff that his "labs show good control [sic] lipids and prediabetic status with no frank diabetes so will leave meds same and recheck glucose status and see in 3 months."  (TR. 318)

In December 2005, Plaintiff was also referred for a surgical consult regarding a "provisional diagnosis" of right inguinal hernia.  (TR. 312) Plaintiff reported that the hernia was "starting to hurt."  (Id.)   In February 2006, Plaintiff was examined by Stephen

Lanzarotti, M.D., for the surgical consult.  (TR. 420-422) Plaintiff stated that he "has had the hernia for many years but it has only recently, over the last few months, started to become painful."  (TR. 420) Plaintiff was concerned about surgery due to his severe asthma.  (Id.) Dr. Lanzarotti indicated that Plaintiff's hernia was "mildly symptomatic at this time."  (TR. 421)  Dr. Lanzarotti opined that Plaintiff

> would be at a pretty high risk for surgical procedure with general anesthetic, but would be a decent candidate for procedure with sedation. [Plaintiff] states that with his last surgery requiring sedation he stopped breathing and required hospitalization which is not expected and now he is a little bit worried about having surgery unless it is absolutely indicated.  I do not feel it is absolutely indicated at this time, but I explained to him that his symptomatic hernia will continue to grow and may become more symptomatic, especially since he has a chronic cough for his emphysema.  He understands this and is willing to accept the risk.

(TR. 421) Ultimately, Plaintiff requested a truss for his hernia because he did not "wish surgery at this time."  (TR. 386; *see also* TR. 387, 421 ("I [Dr. Lanzarotti] ordered a truss..." for Plaintiff))

On March 13,  2006, Plaintiff presented to NP Bowdish with complaints of "a flare in asthma the past 2-3 days."  (TR. 416) She prescribed a "brief course of oral steroids" and continued Plaintiff on inhalers.  (TR. 418)  By March 20, 2006, Plaintiff reported that he was feeling better "with minimal [shortness of breath] and cough only at night...still smoking but much less and trying to quit."  (TR. 414) NP Bowdish continued Plaintiff on steroids.  (TR. 415)

On July 12, 2006, Plaintiff reported that he had been to Oregon two weeks previously and was experiencing "increase in cough since and notes his throat is tight and he is awake [sic] to cough at night more than once a night more than 7 days a week."  (TR. 401-402) He also had sinus congestion.  (TR. 402)  He was using a nebulizer and "taking adviar [sic]...xopoenx. on monoleukast."  (Id.)  Lorna Cook, GPN, assessed "asthma with sig upper airway issue..."  (TR. 403)

On July 27, 2006, Plaintiff reported to NP Bowdish that he "was doing quite well on regimen for asthma but has had three episodes of sinus congestion with flare in asthma over

- 12 -

the past 3+ months and..." only steroids seem to help.  (TR. 398) NP Bowdish assessed "asthma–not well controlled likely due to sinus congestion which may be infection but more likely allergic...."  (TR. 400) She extended Plaintiff's course of steroids and discussed "smoking conceerns [sic]."  (Id.)  A July 28, 2006 radiology report regarding views of Plaintiff's chest showed no evidence of active pulmonary disease.  (TR. 376)

In August 2006, Plaintiff saw NP Bowdish on follow up for a flare in asthma symptoms including coughing and sinus congestion.  (TR. 393) He reported some improvement after completing a course of antibiotics but he still awoke during the night with coughing and tightness in his upper chest. (Id.)  He stated that he was not smoking "except rare cigarette during daytime." (Id.) NP Bowdish's assessment was "asthma with some sinus congestion–improved but still has a lot [sic] of congestion and coughing at night–might be having problems with reflux as taking PPI in morning so will increase dosage to see if helps and continue remainer [sic] of regimen."   (TR. 394-395) She also assessed "[h]yperglycemia–borderline diabetes..." and hypertension. (TR. 395)

As of August 2006, Plaintiff was taking the following medications: Acetaminophen with Hydrocodone for pain, Albuterol inhaler for shortness of breath, Alprazolam, Amoxicillin/Clavulanate for infection, Brimonidine for glaucoma, Chlorphenir for allergies, Felodipine and Trimterene for blood pressure, Flunisolide nasal spray for allergies, Fluticasone/Salmeterol diskus to prevent shortness of breath, Guaifen for cough, Levalbuterol inhaler for shortness of breath, Montelukast, Omeprazole to prevent heartburn and acid reflux, Potassium CL, Simvastatin to lower cholesterol, and Travoprost for eyes. (TR. 394)

### b.    Musculoskeletal Conditions

A July 1999 record generated by an unknown practitioner reflects Plaintiff's complaints of upper back pain, "pain to palpation in his muscles in his upper back" on physical examination,  and that Celebrex was prescribed. (TR. 251) A July 1999 radiologic exam of Plaintiff's thoracic spine was normal.  (TR. 252) However, a September 8, 1999

MRI of Plaintiff's thoracic spine denoted mild thoracic spondylosis with early disc degeneration and bulging at T7-8.  (TR. 169) A September 8, 1999 MRI of Plaintiff's cervical spine showed: cervical spondylosis with discogenic changes, most marked at C6-7; asymmetrical left posterolateral hard disc bulging at C3-4 with associated moderate left foraminal stenosis; and mild disc bulging, more to left, at C6-7.  (TR. 170-171) Also noted was: "[d]isc space is lost at C3-4 and C6-7.  This may suggest acute herniation." (TR. 170)

In January 2002, Plaintiff complained to PA Goldsmith about back pain and that "his back has been bothering him more lately in his mid spine."  (TR. 227) She assessed osteoarthritis involving the spine and refilled his prescription for Lortab.  (TR. 230)

On August 7, 2002, Plaintiff presented to PA Goldsmith with complaints of posterior headache and onset of neck pain.  (TR. 224) Plaintiff first started experiencing the headaches, which lasted for a few hours, in April 2002.  (Id.)  He now experiences them every day and they last two to three days at a time.  (Id.)  Lortab and lying down helps.  (Id.)  He reported that he has neck arthritis.  (Id.)  He stated that he had a home traction device for neck traction.  (Id.)  PA Goldsmith assessed headache for which she prescribed felxeril and use of Plaintiff's home traction device.  (TR. 226)  By March 2003, PA Goldsmith indicated Plaintiff's headache condition was stable, that he was taking Flexeril, and that he took "Lortab when neck pain and H[ead] A[ches] get worse with good relief."   (TR. 220)

In September 2004, Plaintiff complained to PA Goldsmith about low back pain.  (TR. 201) PA Goldsmith noted that Plaintiff walked without assistance.  (Id.)  Her assessment included osteoarthritis involving the spine.  (TR. 204)

On January 19, 2005, Plaintiff underwent a lumbar spine radiologic series for complaints of worsening chronic lower back pain.  (TR. 173) Results showed "minimal anterior osteophyte formation at multiple levels without other abnormal findings."  (Id.)

In January 2005, Plaintiff also complained of left knee pain associated with a 2004 injury.  (TR. 185) On physical examination, PA Goldsmith found that Plaintiff's knee was normal in appearance and Plaintiff had good range of motion and stability without crepitance.

(TR. 188) His knee was tender.  (Id.)  She noted that Plaintiff walked with a cane.  (Id.)  A January 19, 2005 radiologic knee series denoted "normal left knee."  (TR. 174) In light of the x-ray result, PA Goldsmith noted that Plaintiff "likely strained a ligament or muscle." (TR. 188)

In July 2005, Plaintiff complained to PA Goldsmith that his coughing affected his disk disease in his neck.  (TR. 355)

On December 1, 2005, Plaintiff complained to NP Bowdish about mild to moderate joint pain or stiffness in the lower and cervical spinal areas.  (TR. 315) December 2005 x-rays of Plaintiff's cervical spine denoted "mild disk height loss at C3-4 and moderate disk height loss at C5-6 and C6-7 with small spurs at C5-6 and C6-7.  Moderate posterior facet arthritis is noted throughout the cervical spine."  (TR. 304) The impression was "[m]oderate spondylosis of the lower cervical spine."  (Id.)  Upon review of the x-rays, NP Bowdish found "some d[egenerative] j[oint] d[isease] of cervical spine without evidence of herniation..."  (TR. 318) Plaintiff felt that he was "doing 'ok' on current pain meds at this time."  (Id.)

December 2005 x-rays of Plaintiff's lumbar spine showed no significant abnormality. (TR. 305)

On July 27, 2006, Janet S. Malave, LPN, noted that Plaintiff "had pain inventory completed today.  A detailed inventory of pain characteristics and interventions is required since this patient had a recent pain score of 3."  (TR. 401) The record does not indicate the source of Plaintiff's pain.

### c.    Vision and Hearing

On March 19, 2003, Plaintiff saw Shawn Galbraith, Optometry Intern, for follow up "IOP [(intraocular pressure)] check."  (TR. 219-220) Diagnoses was primary open angle glaucoma (hereinafter "POAG") with stable intraocular pressure in both eyes.  (TR. 220) Plaintiff was directed to continue using Xalatan and Alphagan.  (Id.)

In October 2003, Plaintiff presented to PA Goldsmith complaining of pain associated with his left ear.  (TR. 216) Plaintiff's wife reported that he had trouble hearing and frequently could not hear the cell phone ringing.  (Id.)   Plaintiff was referred for consult. (TR. 219)

In January 2005, Plaintiff reported to Dennis Sory, CRTT,  that he noticed decreased hearing.  (TR. 193) He had not had an audiogram.  (Id.)

In December 2005, Plaintiff reported to NP Bowdish that he recently "got bilateral hearing aide [sic] but not working well."  (TR. 314) She advised Plaintiff that he was not eligible for help "through this [sic] VA for..." hearing aides.  (Id.)

In December 2005, Plaintiff was examined by Jason Powell, Optometrist, upon referral from NP Bowdish.  (TR. 388-392) The assessment was "glaucoma per p[atient] history."  (TR. 392) Plaintiff was directed to continue his present medication of Alphagan and Travatan.  (Id.)  In April and May 2006, Optometrist Powell's assessment was "POAG vs Ocular hypertension" in both eyes.  (TR. 408, 413)

In August 2006, Plaintiff saw Optometrist Powell for follow up.  (TR. 395-398) Optometrist Powell found that Plaintiff's "IOPS slightly elevated."  (TR. 397) Assessment was "POAG vs ocular hypertension" in both eyes.  (Id.)  Optometrist Powell questioned whether elevated IOPS could be secondary to Predisone use.  (Id.)  He continued Plaintiff on his current medications and would retest after Predisone taper.  (TR. 398)

### 2.      Examining State Agency Physician

After the February 23, 2006 hearing, Plaintiff was examined by Jerome Rothbaum, M.D., at the ALJ's request.  Such examination occurred on May 5, 2006.  (TR. 333) Dr. Rothbaum's report reflects that he reviewed Plaintiff's previous medical records including spirometric studies and 1999 MRIs and x-rays denoting "asymmetrical left posterior lateral had disc bulging at C3-C4 with associated moderate left foraminal stenosis and mild disc bulging at C6-C7", and "cervical spondylosis with discogenic changes most marked at C6-C7."  (Id.; *see also* TR. 336 ("Extensive medical evidence of records has been perused as part

of this examination."))  During physical examination, Plaintiff had, in pertinent part, a "constant dry cough" and "[f]lexion of the lumbosacral spine is to 65 degrees...[Plaintiff] could go no further because he indicated this caused him severe dyspnea." (TR. 335) "There is no pain noted of the neck." (Id.) Dr. Rothbaum also noted that Plaintiff "squats approximately one-third of the normal distance complaining of pain above the patella on the left primarily involving the quadriceps tendon.  He walks with an antalgic gait, limping on the left leg.  He does have a cane which he uses in his left hand."  (TR. 335-336) Dr. Rothbaum also performed pulmonary function tests.  (TR. 342-346)  Dr. Rothbaum's impression was:

1.    Bronchial asthma, possible Sampter's syndrome (asthma, nasal polyps, aspirin sensitivity).
2.    Possible remote nasal polyps.
3.    Cervical spondylosis.
4.    Diabetes mellitus, diet controlled.
5.    Bilateral glaucoma, status post surgical treatment.
6.    Gastroesophageal reflux disease.
7.    Chronic sprain left quadriceps muscle.
8.    Right indirect inguinal hernia.

(TR. 336)

Dr. Rothbaum completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) wherein he indicated that Plaintiff could lift up to 20 pounds occasionally[6] and less than 10 pound frequently[7] due to "cervical spondylosis[,] chronic asthma." (TR. 338) Dr. Rothbaum further indicated that Plaintiff could "lift 5 [pounds every] 1-2 hours" with his left side.[8]  (TR. 338) Plaintiff could stand and/or walk at least 2 hours in

─────────────────────

[6]"Occasionally means occurring from very little up to one-third of an 8-hour workday (cumulative, not continuous)."  (TR. 338)

[7]"Frequently means occurring one-third to two-thirds of an 8-hour workday (cumulative, not continuous)."  (TR. 338)

[8]Both Plaintiff and Defendant refer to Dr. Rothbaum's report as limiting Plaintiff to lifting 5 pounds one to two times per hour with his left upper extremity.  (Plaintiff's MSJ, p. 9; Defendant's Statement of Facts (Doc. No. 31) p.3)  Review of  Dr. Rothbaum's

an 8-hour workday and Dr. Rothbaum also indicated that Plaintiff "can stand/walk 3-4 [hours] 20-30 minutes at a time [with] 10 minute break" due to "asthma, cervical spondylosis, chronic strain L. quadriceps."  (Id.)  Plaintiff's ability to sit was not limited. (TR. 339) However, he was limited in pushing and/or pulling with his upper extremities due to "chronic neck pain" and "dyspnea assoc. [with] asthma." (Id.) Plaintiff could never climb ladders, ropes, or scaffolds.  (Id.) He could occasionally climb ramps and stairs and he could occasionally balance, kneel, crouch, crawl, and stoop.  (Id.)  He was limited to occasional reaching in all directions including overhead.  (TR. 340) Dr. Rothbaum indicated that, due to Plaintiff's asthma, Plaintiff should have limited exposure to temperature extremes, dust, humidity/wetness, hazards (such as machinery, heights), fumes, odors, chemicals and gases. (TR. 341) He  found no limitations with regard to seeing, hearing, and speaking.  (TR. 340)

### 3.    Non-Examining State-Agency Physicians

On December 3, 2004, Ward Dickey, M.D., completed a Physical Residual Functional Capacity Assessment concerning Plaintiff wherein he opined that Plaintiff could lift up to 20 pounds occasionally and up to 10 pounds frequently; he could stand and/or walk about 6 hours in an 8-hour work day; and he could sit about 6 hours in an 8-hour work day with normal breaks.  (TR. 152).  Plaintiff had no limitations in pushing and/or pulling.  (Id.)  To support his opinion, Dr. Dickey cited examinations and tests dating to 2004 primarily concerning Plaintiff's ability to breathe including a spirometry and echocardiogram.  (TR. 153) Further according to Dr. Dickey, Plaintiff could frequently stoop and occasionally climb ramps, stairs, ladders, ropes, and scaffolds, balance, kneel, crouch, and crawl all due to shortness of breath and diagnosis of hernia.  (TR. 153) Plaintiff had no manipulative limitations, and Dr. Dickey found Plaintiff was able to reach in all directions including

---

handwritten comment could support either the parties' rendention or that Dr. Rothbaum was indicating that Plaintiff "can lift 5" pounds one to two times per hour without reference to the left side.  (*See* TR. 338) The ALJ's decision does not discuss Dr. Rothbaum's notation.

overhead.  (TR. 154)  Dr. Dickey indicated that Plaintiff should "avoid even moderate exposure" to "fumes, odors, dusts, gases, poor ventilation, etc." due to asthma diagnosis. (TR. 155)  Dr. Dickey found no visual limitations or communicative limitations.  (TR. 154-155) He also indicated that Plaintiff was unlimited with regard to exposure to extreme cold or heat, wetness, humidity, noise, vibration, and hazards such as machinery and heights. (TR. 155)  Dr. Dickey further indicated that Plaintiff was "credible in that he does have an M[edically] D[eterminable] I[mpairment]."  (TR. 156)

Dr. Dickey's report bears what appears to be a rubber stamp imprint stating: "have reviewed all the evidence in file, and the assessment of 12/3/04[9] is affirmed as written." (TR. 158) Such imprint is signed by Leslie Arnold, M.D. and dated September 1, 2005.  (Id.)

C.     Vocational Expert Testimony

At the February 23, 2006 hearing, Vocational Expert (hereinafter "VE") Kathleen McAlpine testified. VE McAlpine identified Plaintiff's past relevant work as an entertainer as light and skilled with a special vocational preparation (hereinafter "SVP") of 8; as a salesman for welding materials as medium and skilled with an SVP of 5; as a car salesman as light and skilled; and as a welder as medium and skilled with an SVP of 7.  (TR. 454)

The ALJ asked the VE a hypothetical question concerning an individual of Plaintiff's age, education and work history who should avoid working in extreme cold or extreme humidity, avoid exposure to excessive amounts of dust, fumes, gases and chemicals; is slightly affected in his ability to work by pain in his neck, back, legs and abdomen; wears hearing aids for slight hearing loss, and  has "some hypertension, insomnia..." which has "a slight affect on his ability..." to work; could stand for two hours; could walk for no more than 15 minutes at a time and not over two hours; should avoid climbing stairs, ladders, and scaffolding.  (TR. 455-456) VE McAlpine responded that such a person could not perform any of Plaintiff's past work.  (TR. 456) However, such person "could probably work as an

---

[9]This date is handwritten on a blank line.

information clerk, receptionist type person.  That's considered sedentary.  It's an SVP of 4"
and would be semi-skilled.  (TR. 456-457; TR. 457 (DOT number 237.367-038))  VE
McAlpine further testified that Plaintiff had the skills appropriate for such a position in light
of his past work in "parts and sales, he had incoming people requesting things and he said
he did the invoice ordering...getting the material ready, invoices.  So, he's able to work with
people and take messages and get phone numbers right and that kind of thing."  (TR. 457)

If the same hypothetical person had added severe breathing problems that are not
alleviated by medication or that would be alleviated by medication that had significant
adverse side effects, there would be no work for that person in the national economy.  (Id.)

### D.    Lay Statements

Plaintiff submitted lay statements from his brother and a friend concerning Plaintiff's
health problems including back pain and difficulty breathing.  (TR. 149-150)

### E.    The ALJ's Findings

#### 1.    Claim Evaluation

SSA regulations require the ALJ to evaluate disability claims pursuant to a five-step
sequential process.  20 CFR §§404.1520, 416.920; *Baxter v. Sullivan,* 923 F.2d 1391, 1395
(9th Cir. 1991).  The first step requires a determination of whether the claimant is engaged
in substantial gainful activity.  20 CFR §§ 404.1520(b), 416.920(b).  If so, then the claimant
is not disabled under the Act and benefits are denied.  *Id.*  If the claimant is not engaged in
substantial gainful activity, the ALJ then proceeds to step two which requires a determination
of whether the claimant has a medically severe impairment or combination of impairments.
20 CFR §§ 404.1520(c), 416.920(c).  In making a determination at step two, the ALJ uses
medical evidence to consider whether the claimant's impairment more than minimally limited
or restricted his or her physical or mental ability to do basic work activities.  *Id.*  If the ALJ
concludes that the impairment is not severe, the claim is denied.  *Id.*  If the ALJ makes a
finding of severity, the ALJ proceeds to step three which requires a determination of whether
the impairment meets or equals one of several listed impairments that the Commissioner

acknowledges are so severe as to preclude substantial gainful activity.   20 CFR §§ 404.1520(d), 416.920(d); 20 CFR Pt. 404, Subpt. P, App.1.  If the claimant's impairment meets or equals one of the listed impairments, then the claimant is presumed to be disabled and no further inquiry is necessary.   If a decision cannot be made based on the claimant's then current work activity or on medical facts alone because the claimant's impairment does not meet or equal a listed impairment, then evaluation proceeds to the fourth step.  The fourth step requires the ALJ to consider whether the claimant has sufficient residual functional capacity ("RFC")[10] to perform past work.   20 CFR §§ 404.1520(e), 416.920(e).  If the ALJ concludes that the claimant has RFC to perform past work, then the claim is denied.   *Id.* However, if the claimant cannot perform any past work due to a severe impairment, then the ALJ must move to the fifth step, which requires consideration of the claimant's RFC to perform other substantial gainful work in the national economy in view of claimant's age, education, and work experience.  20 CFR §§ 404.1520(f). 416.920(f).   At step five, in determining whether the claimant retained the ability to perform other work, the ALJ may refer to Medical Vocational Guidelines ("grids") promulgated by the SSA.  *Desrosiers v. Secretary,* 846 F.2d 573, 576-577 (9th Cir. 1988).   The grids are a valid basis for denying claims where they accurately describe the claimant's abilities and limitations.  *Heckler v. Campbell,* 461 U.S. 458, 462, n.5 (1983).   However, because the grids are based on exertional or strength factors, where the claimant has significant nonexertional limitations, the grids do not apply.  *Penny v. Sullivan,* 2 F.3d 953, 958-959 (9th Cir. 1993); *Reddick v. Chater,* 157 F.3d 715, 729 (9th Cir. 1998). Where the grids do not apply,  the ALJ must use a vocational expert in making a determination at step five.  *Desrosiers,* 846 F.2d at 580.

---

[10]Residual functional capacity is defined as that which an individual can still do despite his or her limitations.  20 CFR § 404.1545, 20 CFR 416§945.

<u>2.      The ALJ's Decision</u>

In his September 22, 2006 decision, the ALJ made the following findings:[11]

1.      The claimant meets the insured status requirements of the Social Security Act through at least December 31, 2007

2.      The claimant has not engaged in substantial gainful activity at any time relevant to this decision. (20 CFR 404.1520(b))

        ***

3.      The claimant has the following medically determinable impairments: bronchial asthma, a history of obesity, cervical spondylosis with disc bulging and moderate left foraminal stenosis, a history of osteoarthritis of the lumbosacral spine with current normal x-rays, "small degenerative disc disease" of the thoracic spine, a chronic sprain of the left quadriceps muscle, bilateral glaucoma (status post surgical treatment in about 1985), gastrointestinal reflux disease (GERD[12]), a history of hypertension, bilateral hearing loss with hearing aids, a right inguinal hernia, and insomnia. (20 CFR 416.920(c)).

        While not all of these impairments are severe if considered separately, the claimant's medically determinable impairments, in combination, are severe (20 CFR 404.1509).

        Although other conditions are mentioned, the Administrate Law Judge finds that they are not "medically determinable impairments," as that term is defined for Social Security purposes.  A medically determinable impairment must be established by evidence from an acceptable source (20 CFR 404.1513).  An impairment must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory techniques (20 CFR 404.1508).  In addition, the impairment must last or be expected to last for at least twelve consecutive months (20 CFR 404.1523).

        ***

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

_____

[11]Citation within the ALJ's findings to the exhibits is omitted unless otherwise indicated.

[12]GERD is the abbreviation for gastro*esophageal* reflux disease.

\*\*\*

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for two out of eight hours, and sit for about six hours in an eight-hour workday; he can never climb stairs, ladders, ropes, or scaffolds.  He must avoid exposure to extreme cold and extreme humidity, and he must avoid exposure to excessive dust, fumes, gases, and chemicals.

\*\*\*

6.      The claimant is unable to perform any past relevant work. (20 CFR 404.1565).

\*\*\*

7.      The claimant was born on March 15, 1946.  He was 57 years old (an individual of "advanced age") on the alleged disability onset date.  Beginning March 15, 2006, he is "closely approaching retirement age."  (20 CFR 404.1563).

8.      The claimant has a limited education and is able to communicate in English (20 CFR 505.1564).

9.      The claimant has acquired skills that transfer to other work within his residual functional capacity.  (20 CFR 404.1568).

        The vocational expert testified that as a parts salesperson, Mr. McElhinney worked with people, responded to requests, gained experience with ordering and invoices, and took messages.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

        ...The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as Information Clerk (D.O.T. 237.367-038) (sedentary and semi-skilled, with a special vocational preparation (SVP) code of "4")...A finding of "not disabled" is appropriate....

\*\*\*

11.     The claimant has not bee under a "disability," as defined in the Social Security Act, from January 1, 2004 through the date of this decision (20 CFR 404.1520(g)).

<u>DECISION</u>

Based on the  application for a period of disability and Disability Insurance Benefits protectively filed on September 17, 2004, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.

(TR. 17-29)

In reaching his decision, the ALJ "generally accepte[d]" Dr. Rothbaum's opinion except for the limitation regarding pushing pulling and reaching because Dr. Rothbaum did not note neck pain on examination and Plaintiff had not received aggressive treatment for same.  (TR. 26-27) Because the ALJ found Plaintiff was limited to sedentary work, the ALJ found Plaintiff "would have no further limitations with pushing or pulling."  (TR. 27)

Additionally, the ALJ stated that although Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms...the claimant's statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible."  (TR. 22) (emphasis omitted)

III.     DISCUSSION

     A.     Argument

Plaintiff argues that the ALJ improperly rejected portions of examining Dr. Rothbaum's residual functional capacity recommendations.  He also argues that the ALJ improperly rejected his credibility.  He requests an immediate award of benefits.

Defendant asserts that the ALJ properly weighed Dr. Rothbaum's opinion and that the ALJ properly assessed Plaintiff's credibility.  Alternatively, Defendant argues that if the ALJ erred, remand for payment is not warranted.  Instead, the matter should be remanded for further proceedings.

     B.     Standard of Review

An individual is entitled to Title II Social Security Disability Insurance benefits if he or she meets certain eligibility requirements and demonstrates the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423, 1382.  "'A claimant will be found disabled only if the impairment is so severe that, considering age, education, and work experience, that person cannot engage in any other kind of substantial gainful work which exists in the national economy.'"  *Penny,* 2 F.3d at 956 (*quoting Marcia v. Sullivan,* 900 F.2d 172, 174 (9th Cir. 1990)).

To establish a *prima facie* case of disability, the claimant must demonstrate an inability to perform his or her former work. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984).  Once the claimant meets that burden, the Commissioner must come forward with substantial evidence establishing that the claimant is not disabled.  *Fife v. Heckler*, 767 F.2d 1427, 1429 (9th Cir. 1985).

The findings of the Commissioner are conclusive and courts may overturn the decision to deny benefits "only if it is not supported by substantial evidence or it is based on legal error."  *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir. 1992)(citations omitted).  Therefore, the Commissioner's determination that a claimant is not disabled must be upheld if the Commissioner applied the proper legal standards and if the record as a whole contains substantial evidence to support the decision.  *Clem v. Sullivan*, 894 F.2d 328, 330 (9th Cir. 1990) (citing *Desrosiers*, 846 F.2d at 575-76; *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983)).  Substantial evidence is defined as such relevant evidence which a reasonable mind might accept as adequate to support a conclusion.  *Jamerson v. Chater,* 112 F.3d 1064, 1067-68 (9th Cir. 1997); *Winans v. Bowen,* 853 F.2d 643, 644 (9th Cir. 1988).  However, substantial evidence is less than a preponderance.  *Matney,* 981 F.2d at 1019.

The Commissioner, not the court, is charged with the duty to weigh the evidence, resolve material conflicts in the evidence and determine the case accordingly. *Id.*  However, when applying the substantial evidence standard, the court should not mechanically accept the Commissioner's findings but should review the record critically and thoroughly.  *Day v. Weinberger*, 522 F.2d 1154 (9th Cir. 1975).  Reviewing courts must consider the evidence that supports as well as detracts from the examiner's conclusion.  *Id.* at 1156.

- 25 -

In evaluating evidence to determine whether a claimant is disabled, the opinions of treating physicians are entitled to great weight. *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989). However, even a treating physician's opinion is not necessarily conclusive on either the issue of a physical condition or the ultimate issue of disability. *Id.* When resolving a conflict between the opinion of a treating physician and that of an examining or non-examining physician, the opinion of the treating physician is entitled to greater weight and may be rejected only on the basis of findings setting forth specific legitimate reasons based on substantial evidence of record. *Magallanes,* 881 F.2d at 751. Moreover, the Commissioner may reject the treating physician's uncontradicted opinion as long as the Commissioner sets forth clear and convincing reasons for doing so. *Magallanes*, 881 F.2d at 751.

Further, when medical reports are inconclusive, questions of credibility and resolution of conflicts in the testimony are functions solely of the Commissioner. *Magallanes,* 881 F.2d at 751 (citations omitted). However, the Commissioner's finding that a claimant is less than credible must have some support in the record. *See Light v. Social Security Administration,* 119 F.3d 789 (9th Cir. 1997); *Connett v. Barnhart,* 340 F.3d 871 (9th Cir. 2003).

C. Analysis

1. Dr. Rothbaum's Opinion

Subsequent to the hearing, Plaintiff was examined by Dr. Rothbaum at the ALJ's request. Thereafter, the ALJ found Plaintiff retained the RFC to perform a range of work that Defendant characterizes as "in between sedentary and light in exertion."[13] (Defendant's

---

[13]"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. §404.1567(a). The full range of sedentary work requires standing and walking for up to two hours and sitting for up to six hours in an eight hour work day. Social Security Ruling (hereinafter "SSR") 83-10. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of

XMSJ, p. 2) The ALJ specifically found that Plaintiff retained the RFC

> to lift and carry 20 pounds occasionally and 10 pounds frequently, stand and/or
> walk for two out of eight hours, and sit for about six hours in an eight-hour
> workday; he can never climb stairs, ladders, ropes, or scaffolds.  He must
> avoid exposure to extreme cold and extreme humidity, and he must avoid
> exposure to excessive dust, fumes, gases, and chemicals.

(TR. 21) Ultimately, the ALJ found that Plaintiff had transferrable skills that allowed him to

perform sedentary work with certain environmental and postural restrictions.  (Id.)

Plaintiff argues that the ALJ, in making the RFC finding, improperly disregarded "the

range of limits the doctor [i.e., Dr. Rothbaum,] described which reduce the Plaintiff's

capacity for even sedentary activity such as the limits [sic] lifting with the left hand, pushing,

pulling and reaching, and exposure to dusts, odors, fumes and other environmental limits as

described by the [D]octor."  (Plaintiff's MSJ, pp. 9-10)

Defendant counters that the ALJ made the appropriate findings.

"The regulations provide progressively more rigorous tests for weighing opinions as

the ties between the source of the opinion and the individual become weaker."  SSR 96-6p.

The regulations are clear that "[u]nless the treating sources's opinion is given controlling

weight, the administrative law judge must explain in the decision the weight given to the

opinions of a State agency medical or psychological consultant or other program physician

or psychologist, as the administrative law judge must do for any opinions from treating

sources, nontreating sources, and other nonexamining sources who do not work for us."  20

C.F.R. § 404.1527(f)(2)(ii); *see also Andrews v. Shalala,* 53 F.3d 1035, 1041 (9th Cir. 1995)

("Both the regulations...and our precedent, *see Pitzer* [*v. Sullivan,*] 908 F.2d [502]...506 n.4

[(9th Cir. 1990)], state that the conclusion of a nonexamining physician is generally entitled

to less weight than the conclusion of an examining physician.")  "However, giving the

examining physician's opinion *more* weight than the nonexamining expert's opinion does

---

walking or standing, or when it involves sitting most of the time with some pushing and
pulling of arm or leg controls."    20 C.F.R. §404.1567(b).  The full range of light work
requires standing and walking for up to six hours in an eight hour work day.  SSR 83-10.

not mean that the opinions of nonexamining sources...are entitled to *no* weight." *Andrews,*
53 F.3d at 1041. *See also* SSR 96-6P (The ALJs "and the Appeals Council are not bound by
findings made by State agency or other program physicians and psychologists, but they may
not ignore these opinions and must explain the weight given to the opinions in their
decisions.")

While the ALJ accepted most of Dr. Rothbaum's residual functional capacity findings,
the ALJ rejected Dr. Rothbaum's recommendation that Plaintiff was limited with regard to
pushing, pulling, and reaching with his upper extremities.  Dr. Rothbaum set out his RFC
finding on a form captioned "Medical Source Statement of Ability to do Work-Related
Activities (Physical)" wherein he checked boxes indicating whether and how Plaintiff was
physically limited.  (TR. 338-341) Spaces were provided for explanation concerning
recommended limitations.   Specifically, Dr. Rothbaum checked a box indicating that
Plaintiff was limited in pushing and /or pulling with upper extremities.  (TR. 339) In the
space provided for identification of "medical/clinical finding(s)" in support of the Doctor's
conclusion for the recommended exertional limitations including pushing/pulling, Dr.
Rothbaum wrote  "chronic neck pain" and "dyspnea assoc. [with] asthma."  (Id.)  Dr.
Rothbaum also indicated by checking boxes, without comment in the space provided for
explanation, that Plaintiff was limited to reaching occasionally.  (TR. 340)

The ALJ stated that he:

generally accepts the opinion of the consultative examiner [Dr. Rothbaum].
He reviewed all of the evidence (Exhibit 4F, p.10 [TR. 333]), including
evidence that was not available to the State Agency.  With the limitations with
standing and/or walking, the claimant is essentially limited to sedentary work.
*The Administrative Law Judge does not accept the consultative examiner's
opinion regarding pushing, pulling, and reaching.  The consultative examiner
based the limitations with pushing and pulling on "chronic neck pain"
(Exhibit 4F, p.7 [TR. 339]), and he did not give any basis for his opinion
regarding limitations with reaching (Exhibit 4F, p.8 [TR. 340]).  However in
examining the claimant, the consultative examiner stated: "no pain noted of
the neck" (Exhibit 4R, p.3).  And as noted, the claimant has not received any
aggressive treatment for neck pain.  The Administrative Law Judge concludes
that because the claimant is limited to sedentary work, he would have no
further limitations with pushing or pulling.  The Administrative Law Judge
finds insufficient basis to establish limitations with reaching.*

- 28 -

(TR. 26-27)(emphasis added).

With regard to Dr. Rothbaum's limitations concerning pushing, pulling, and reaching, Defendant stresses that the ALJ may reject even the opinion of a treating physician if such opinion is conclusory, brief, and unsupported.  (Defendant's XMSJ, p.5 (citations omitted) It is well-settled that "the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Lester v. Chater,* 81 F.3d 821, 831 (9th Cir. 1995) (*citing Andrews,* 53 F.3d at 1045).  The ALJ satisfies this burden "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof and making findings." *Magallanes,* 881 F.2d at 751 (citation omitted).

To the extent the non-treating physician's opinion rests on objective medical tests, it must be viewed as substantial evidence. *Id.* Dr. Rothbaum's opinion is based on his review of the medical record including pulmonary function tests, MRIs and other radiologic tests, his own physical examination of Plaintiff, and additional pulmonary function tests that Dr. Rothbaum performed.

Defendant asserts that Dr. Rothbaum's "pushing, pulling and reaching limitations were assessed 'without comment,'..." (Defendant's XMSJ, p. 3) While Defendant is correct that Dr. Rothbaum did not provide a specific comment in the section of his RFC recommendation related to the reaching limitation, Dr. Rothbaum did provide a statement to support his recommended exertional limitations regarding frequent lifting ("cervical spondylosis, chronic asthma"), standing and/or walking ("asthma, cervical spondylosis, chronic strain L. quadriceps"), and pushing and pulling ("chronic neck pain, dyspnea assoc. [with] asthma").[14]  (TR. 338-339)

The ALJ acknowledged that Plaintiff suffered from multiple "medically determinable

---

[14]Dr. Rothbaum's reference to "chronic neck pain" and "dyspnea assoc. [with] asthma" pertained to all exertional limitations listed in his RFC including pushing/pulling. (TR. 339)

impairments" including "bronchial asthma," "cervical spondylosis with disc bulging and moderate left foraminal stenosis..." (TR. 20) He also determined that all of Plaintiff's medically determinable impairments considered in combination were severe. (Id.) The ALJ additionally stated that the evidence supported Plaintiff's allegation that "his only significant impairment is asthma." (TR. 26) The ALJ agreed with Plaintiff's allegations that due to asthma, Plaintiff "cannot tolerate pulmonary irritants and he cannot tolerate more than minimal exertion." (TR. 26)

In discounting Dr. Rothbaum's pulling/pushing restriction, the ALJ never discussed Dr. Rothbaum's reference to "dyspnea assoc. [with] asthma." (TR. 339) Thus, the ALJ neither discussed nor set out specific and legitimate reasons to discount Dr. Rothbaum's opinion that Plaintiff's limited ability to push and/or pull was, at least in part, associated with Plaintiff's asthma. The ALJ's failure to address this portion of Dr. Rothbaum's statement is especially troubling given that the ALJ agreed that Plaintiff's asthma limited other aspects of physical exertion that also necessarily involved Plaintiff's upper extremities (i.e., lifting and carrying).

The ALJ did set forth his reasons for disagreeing with Dr. Rothbaum's opinion that Plaintiff's "chronic neck pain" limited his ability to push/pull. The ALJ discounted Dr. Rothbaum's opinion because the Doctor noted no neck pain on physical examination. (TR. 27) The ALJ also discounted Dr. Rothbaum's reference to neck pain because Plaintiff had not received any aggressive treatment for it. (Id.) Elsewhere in his decision, the ALJ comments that there is no evidence that Plaintiff "was referred for physical therapy or acupuncture, and no evidence that his doctors considered his pain [musculoskeletal] significant enough to refer him to a pain management specialist." (TR. 26)

The record reflects that since September 1999, Plaintiff complained of neck pain and was prescribed painkillers including Vicodin. He was also prescribed Flexeril. A September 1999 MRI of Plaintiff's cervical spine denoted cervical spondylosis with discogenic changes most marked at C6-7, asymmetrical left posterolateral hard disc bulging at C3-4 with

associated moderate left foraminal stenosis, and mild disc bulging, more to left, at C6-7. (TR. 170-171) In 2005, he reported that coughing associated with his breathing difficulties affected his neck condition and that he felt mild to moderate joint pain and stiffness in his cervical spinal area. December 2005 x-rays denoted "mild disk height loss at C3-4 and moderate disk height loss at C5-6 and C6-7 with small spurs at C5-6 and C6-7. Moderate posterior facet arthritis is noted throughout the cervical spine. (TR. 304) The impression was "[m]oderate spondylosis of the lower cervical spine." (Id.) In 2006 LPN, Malave noted that "[a] detailed inventory of pain characteristics and interventions is required since this patient had a recent pain score of 3."[15] (TR. 401)

Dr. Rothbaum "reviewed all of the evidence...including evidence that was not available to the State Agency..." non-examining physicians. (TR. 25, 333-334) Notably, the ALJ did not disagree with Dr. Rothbaum's diagnosis of cervical spondylosis. Nor did the ALJ specifically discount Dr. Rothbaum's citation to cervical spondylosis, among other factors, to support the limitations Dr. Rothbaum assessed with regard to other exertional activities. (*See* TR. 338) Moreover, elsewhere in his decision, the ALJ included cervical spondylosis among Plaintiff's medically determinable impairments and found that such impairment was severe when considered in combination with Plaintiff's other impairments. (TR. 20) The ALJ also found that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, although not to the intensity, duration and limiting effects as claimed by Plaintiff. (TR. 22) Inherent in the ALJ's finding is the conclusion that although Plaintiff's pain associated with cervical spondylosis may not be as severe as Plaintiff claimed, nonetheless, such impairment "could reasonably be expected to produce the alleged symptoms..." which included pain. (Id.) At the hearing, which occurred prior to Dr. Rothbaum's examination and report, the ALJ considered

---

[15]The source of Plaintiff's pain and the type of pain scale LPN Malave used to measure Plaintiff's pain remains unclear. Whatever the scale, Plaintiff's pain score was significant enough to require a detailed follow up.

Plaintiff's neck pain to only have "a slight affect on [Plaintiff's] ability to do basic work activity." (TR. 455)

The Ninth Circuit has found permissible an ALJ's inference that the plaintiff's back pain "was not as all-disabling as he reported in light of the fact that he did not seek an aggressive treatment program and that he did not seek an alternative or more tailored treatment program after he stopped taking an effective medication due to mild side-effects." *Tommasetti v. Astrue*, ____ F.3d ___, 2008 WL 2762439 *3 (9th Cir. July 17, 2008) (*citing Parra v. Astrue*, 481 F.3d 742, 750-751 (9th Cir. 2007); *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999)). Here, there is no indication in the record that more aggressive treatment than that received, physical therapy, or acupuncture would alleviate Plaintiff's symptoms and/or was appropriate treatment in Plaintiff's case. Regardless, the question is not whether Dr. Rothbaum's finding of chronic neck pain meant that such pain was "all disabling." *Id., see also Meanel*, 172 F.3d at 1114 (plaintiff complained of pain "approaching the highest level imaginable..." which caused her to remain in a fetal position). The question here is more precisely one of degree–whether the substantial evidence of record supports Dr. Rothbaum's finding that Plaintiff's neck pain in combination with dyspnea associated with asthma could limit Plaintiff's ability to push and/or pull with his upper extremities and, if so, how would such limitation impact Plaintiff's RFC. As stated *supra* there is no question that the substantial evidence of record supports a finding of impairment concerning Plaintiff's cervical spine and that Plaintiff experienced some degree of neck pain associated with cervical spondylosis with disc bulging and moderate left foraminal stenosis. On this record the ALJ's rejection of Dr. Rothbaum's assessed pushing/pulling limitation fails to specifically and legitimately account for the combined impact of dyspnea associated with asthma alone and in combination with chronic neck pain. "Where the Commissioner fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, we credit that opinion as a matter of law." *Lester,* 81 F.3d at 834 (citation omitted).

The ALJ's failure to meet his burden in rejecting Dr. Rothbaum's opinion, in turn,

invalidates the VE's testimony.  In his decision, the ALJ stated that "because the claimant is limited to sedentary work, he would have no further limitations with pushing or pulling." The ALJ further acknowledged that Plaintiff's "ability to perform all or substantially all of the requirements of the level of work has been impeded by additional limitations"  (TR. 28), which, in turn, led the ALJ to request assistance from the VE. "Based on the testimony of the vocational expert, the [ALJ] conclude[d] that, considering the claimant's age, education, work experience, and residual functional capacity..." Plaintiff could perform other work. (TR. 28)

"Hypothetical questions posed to the vocational expert must set out *all* the limitations and restrictions of the particular claimant..."   *Embrey v. Bowen,* 849 F.2d 418, 423 (9th Cir. 1988).  However, the ALJ is not required to include limitations in his hypothetical questions that he did not include in his RFC.  *See Rollins v. Massanari,* 261 F.3d 853, 857 (9th Cir. 2001).  Here, the ALJ did not include pushing/pulling limitations in his hypothetical questions directed to the VE.  Because the ALJ improperly rejected Dr. Rothbaum's assessment of such limitation, omission of that limitation from the hypothetical questions was erroneous and invalidates the VE's opinion.[16]  *See Embrey,* 849 F.2d at 423 ("Because the hypothetical posed by the ALJ to the vocational expert did not reflect all of [the plaintiff's] limitations, the expert's opinion has no evidentiary value and cannot support the ALJ's decision." )

A similar conclusion applies to Dr. Rothbaum's opinion that Plaintiff is limited to frequently lifting 5 pounds (on left), see *supra*, at p. 17 n.8, every one to two hours.  The ALJ's decision is very specific that he rejected Dr. Rothbaum's opinion with regard to limitations concerning pushing, pulling and reaching.  The ALJ did not include such a lifting

---

[16]The VE testified before Dr. Rothbaum examined Plaintiff and issued his opinion. There is no indication that before issuing his decision,  the ALJ could not have supplemented the record with written questions to the VE or required further testimony incorporating Dr. Rothbaum's additional limitations had the ALJ chosen to accept them.

restriction in the hypothetical questions posed to the vocational expert.  The ALJ found that Plaintiff could lift and carry 10 pounds frequently.  (TR. 21)  The ALJ's decision is silent with regard to the impact, if any, that Dr. Rothbaum's lifting restriction would have on Plaintiff's ability to work as an information clerk.

With regard to Dr. Rothbaum's opinion that Plaintiff was limited to only occasional reaching, it cannot be disputed that Dr. Rothbaum did not write an explanation in the space provided.  The ALJ found "insufficient basis to establish limitations with reaching." (TR. 27) Plaintiff argues that "in light of the fact that [Dr. Rothbaum] restricted the other functions involving large movements of the upper extremities such as pushing, pulling, and lifting due to the Plaintiff's asthma and chronic neck pain, it seems reasonable a limitation in reaching would be consistent with those findings."  (Plaintiff's MSJ, p.11) Plaintiff also cites to medical records reflecting his complaints of neck pain, and numbness and tingling in his arms, and that he was prescribed Vicodin.  (Id.)

Plaintiff's argument is reasonable and persuasive.  Dr. Rothbaum did not merely complete a check-box form as Defendant argues.  He reviewed the record, conducted his own tests and physical examination.  In assessing exertional restrictions, Dr. Rothbaum consistently cited Plaintiff's cervical and asthmatic conditions.

Defendant stated that Plaintiff did not identify any reaching limitations.  (Defendant's XMSJ, p. 11 (citing TR. 133)) The record Defendant cites is a form wherein Plaintiff had the opportunity to check a box indicating that his conditions affected his ability to reach.  (TR. 133) Plaintiff did not check that box.  Yet, in that same form, Plaintiff stated that his ability to bathe was affected because he had "a harder time reaching in different direction."  (TR. 129) Defendant also argues that "Plaintiff admitted to activities that require a certain amount of reaching such as driving, riding a motorcycle and camping."  (Defendant's XMSJ, p.6) The question here is not whether Plaintiff can reach at all, but rather the degree of reaching on occasion.  Moreover, the ALJ did not cite such activities as inconsistent with Dr. Rothbaum's recommendation that Plaintiff was limited to reaching only occasionally.

Defendant further stresses that non-examining Doctors Dickey and Arnold did not assess any reaching limitations.  The ALJ did not state that he accepted the non-examining doctors' opinions over examining Dr. Rothbaum's opinion.  Instead, the ALJ emphasized that Dr. Rothbaum had the benefit of reviewing "all of the evidence...including evidence that was not available to" the non-examining doctors.  (TR. 26) The ALJ's decision is devoid of any indication that he has accorded weight to the opinions of the non-examining doctors.  *See* 20 C.F.R § 404.1527(f)(2)(ii) ("Unless the treating source's opinion is given controlling weight, the [ALJ] must explain in the decision the weight given to the opinions of...[state agency non-examining physicians], as the [ALJ] must do for any opinions from treating sources, nontreating sources and other nonexamining sources who do not work for us.")

In sum, sufficient evidence of record supported Dr. Rothbaum's reaching restriction despite the fact that he did not indicate a detailed explanation for such restriction in the space provided on the form he completed.  The reason cited by the ALJ for rejecting Dr. Rothbaum's reaching limitation cannot stand.  Because the hypothetical posed to the VE did not include the reaching restriction, the VE's testimony is invalidated.  *See Embry,* 849 F.2d at 423; *(see also* Plaintiff's MSJ, p. 20 ("the Information Clerk is a job which requires frequent reaching, as well as the other characteristics of sedentary work such as the capacity to lift 10 lbs. regularly.") (citing DOT 237.367-038; *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles*, p. 336)).

Plaintiff also takes issue with the environmental limitations the ALJ included in his RFC.  The ALJ found that Plaintiff "must avoid exposure to extreme cold and extreme humidity, and he must avoid exposure to excessive dust, fumes, gases, and chemicals." (TR. 21) Dr. Rothbaum recommended that due to asthma Plaintiff was "limited" with regard to exposure to temperature, dust, humidity/wetness, hazards, fumes, odors, chemicals, gases. (TR. 341) Dr. Rothbaum did not address the specific degree of limitation.  The non-examining physicians opined that Plaintiff should avoid "even moderate exposure" to "[f]umes, odors, dusts, gases, poor ventilation, etc."  (TR. 155) The non-examining

physicians found no other environmental limitations. (Id.) The position of Information Clerk does not involve exposure to weather, extreme cold, extreme heat, humidity or wetness, moving mechanical parts, heights, chemicals, or "other environmental conditions." *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles*, pp. 336, D1-2.

Plaintiff takes issue that the ALJ assessed a lower degree of exposure to fumes, odors, dust, gases, etc., than assessed by the non-examining physicians. Plaintiff also argues that "[i]n the event [he] experiences greater symptoms on cold days or at other times when environmental pollutants are elevated, it might result in missed work to a degree of frequency which would make it untenable for a reasonable employer to maintain him in a workplace. [Plaintiff] testified having good days about 50% of the time and bad days 50% of the time." (Plaintiff's Reply, p.4)

The ALJ indicated that he was generally accepting Dr. Rothbaum's opinions over the non-examining physicians, in part, because Dr. Rothbaum reviewed information that had not been available to the non-examining physicians. Dr. Rothbaum also examined Plaintiff and conducted pulmonary function tests. The ALJ adopted all of the environmental restrictions listed by Dr. Rothbaum. The ALJ satisfied his burden with regard to the environmental limitations.

### 2.    Plaintiff's Credibility

Plaintiff argues that the ALJ rejected Plaintiff's credibility without providing clear and convincing reasons. "There is no reference to any specific item of evidence that detracts from Plaintiff's testimony." (Plaintiff's MSJ, p.13)

Defendant argues that the ALJ satisfied his burden.

When assessing a claimant's credibility, the "ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment." *Orn v. Astrue,* 495 F.3d 625, 635 (9th Cir. 2007) (internal quotation marks and citation omitted). However, where, as here, the claimant has produced objective medical evidence of an underlying impairment that

could reasonably give rise to the symptoms and there is no affirmative finding of malingering by the ALJ, the ALJ's reasons for rejecting the claimant's symptom testimony must be specific, clear and convincing. *Tommasetti,* ___ F.3d ___, 2008 WL 2762439, * 3; *Orn,* 495 F.3d at 635*; Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 883 (9th Cir. 2006). Additionally, "[t]he ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion." *Smolen v. Chater,* 80 F.3d 1273, 1284 (9th Cir. 1996); *see also Orn,* 495 F.3d at 635 (the ALJ must provide specific and cogent reasons for the disbelief and cite the reasons why the testimony is unpersuasive). In assessing the claimant's credibility, the ALJ may consider ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements about the symptoms, and other testimony from the claimant that appears less than candid; unexplained or inadequately explained failure to seek or follow a prescribed course of treatment; the claimant's daily activities; the claimant's work record; observations of treating and examining physicians and other third parties; precipitating and aggravating factors; and functional restrictions caused by the symptoms. *Smolen,* 80 F.3d at 1284. *See also Robbins,* 466 F.3d at 884 ("To find the claimant not credible, the ALJ must rely either on reasons unrelated to the subjective testimony (e.g., reputation for dishonesty), on conflicts between his testimony and his own conduct; or internal contradictions in that testimony.")

The ALJ began his credibility assessment with the finding that although Plaintiff's medically determinable impairments could be reasonably expected to produce the alleged symptoms, Plaintiff's "statements concerning the intensity, duration, and limiting effects of these symptoms are not entirely credible." (TR. 22) After a thorough description of the medical evidence, the ALJ described Plaintiff's daily activities. Defendant points to the ALJ's observation that Plaintiff went camping, grilled outdoors, occasionally sang at nursing homes, drove a car and motorcycle, visited friends, took out the trash, shopped, performed light repairs, and washed dishes. (Defendant's XMSJ, p. 7 (citing TR. 25)) The ALJ also noted that Plaintiff woke up often due to shortness of breath, that bending cut off Plaintiff's

airway and that Plaintiff did not clean or do yard work due to exposure to chemicals and dust. (Id.)

Next, the ALJ considered the location, duration, frequency, and intensity of Plaintiff's pain or other symptoms, and the factors that precipitates and aggravates the symptoms, Plaintiff's medication history and side effects. (TR. 25) The ALJ found "no evidence that [Plaintiff] has complained of side effects" from medication. (Id.) As to treatment other than medication, the ALJ pointed out that Plaintiff was prescribed a nebulizer, "otherwise the evidence of treatment other than medication is inconsistent with significant impairment." (TR. 26) With regard to asthma, Plaintiff argues that "[s]hort of inpatient hospitalization and maintenance, it is difficult to see what additional treatment [Plaintiff] could undergo as the combination of nebulizer treatment and inhaler medications reflect the ongoing application of bronchodilators and steroids." (Plaintiff's Reply, p.6)

The ALJ noted that with regard to Plaintiff's musculoskeletal complaints, Plaintiff was not referred for physical therapy or acupuncture nor did his doctors consider "his pain significant enough to refer him to a pain management specialist." (TR. 26) The Court has addressed this aspect of the ALJ's finding *supra* with regard to neck pain. While the ALJ's observations is correct concerning the lack of referral for physical therapy or acupuncture, the ALJ does not cite support for the conclusion that such alternative treatment would be appropriate in Plaintiff's case. Moreover, the ALJ did not mention the 2006 record indicating that Plaintiff required a detailed pain inventory because of the level of pain he was experiencing.

The ALJ also stated that there was no evidence of treatment for glaucoma other than medication and that there was no evidence that Plaintiff's allegations of mental health symptoms were significant enough to warrant mental health treatment. Nor was there evidence that Plaintiff required treatment for hearing loss. The ALJ further noted that there was no evidence Plaintiff required surgery for his hernia and that before 2005, Plaintiff declined surgery. The record reflects that in February 2006, Dr. Lanzarotti did "not feel it

[surgery] is absolutely indicated at this time, but I explained to [Plaintiff] that his symptomatic hernia will continue to grow and may become more symptomatic especially since he has a chronic cough..." (TR. 421) Dr. Lanzarotti also pointed out that Plaintiff "would be at a pretty high risk for surgical procedure with general anesthetic but would be a decent candidate for procedure with sedation..." (Id.)  Plaintiff requested a truss.

Regarding measures other than treatment, the ALJ noted that Plaintiff mentioned that he stays indoors on windy days.  The ALJ made no mention that Plaintiff used a traction device at home for neck pain and that he used a cane for leg pain albeit neither of these products were prescribed.

The ALJ concluded that "[i]n general, the claimant's allegations are credible.  He cannot tolerate pulmonary irritants and he cannot tolerate more than minimal exertion.  The [ALJ] believes that the residual functional capacity discussed reasonably accommodates the claimant's complaints regarding asthmatic symptoms."  (Id.)  The ALJ's credibility assessment credits to some extent Plaintiff's allegations concerning asthma and to discount Plaintiff's allegations of other symptoms including pain. The ALJ's credibility assessment with regard to Plaintiff's symptoms associated with asthma, glaucoma, mental health, hearing loss, and hernia is supported by substantial evidence in the record as discussed by the ALJ and the ALJ has set forth sufficient reasons to satisfy his burden for his conclusion.  In contrast, the ALJ's reasons for discounting Plaintiff's pain testimony (i.e. "musculoskeletal complaints" (TR. 26)) is sparse.  Nonetheless, the record does support a finding that Plaintiff's pain associated with musculoskeletal conditions is not disabling in and of itself. However, the record also supports the conclusion that Plaintiff's neck pain may limit Plaintiff more than a slight degree when considered in combination with his asthma.  The ALJ did not account for same in his RFC finding.

IV.   CONCLUSION

Plaintiff requests that the Court remand the matter for an immediate award of benefits or, in the alternative, remand for further proceedings.  (Reply, p.7) Defendant requests that

if the Court determines that the ALJ's error is not harmless, then the matter should be remanded for further proceedings.

Remand for an award of benefits is appropriate where:

(1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004) (citations omitted).  Where the test is met, "we will not remand solely to allow the ALJ to make specific findings...Rather we take the relevant testimony to be established as true and remand for an award of benefits." *Id*. (citations omitted); *see also Lester,* 81 F.3d at 834.

As discussed above, the ALJ failed to provide legally sufficient reasons to reject Dr. Rothbaum's exertional (lifting, pushing and/or pulling) and manipulative (reaching) limitations.   Because the ALJ failed to provide adequate reasons for rejecting Dr. Rothbaum's opinion, that opinion is credited as a matter of law. *Lester,* 81 F.3d at 834 (citation omitted).  Additionally, crediting Dr. Rothbaum's opinion that Plaintiff experiences "chronic neck pain" as true necessarily works to credit Plaintiff's subjective testimony regarding such pain as well.  However, even when crediting Dr. Rothbaum's limitations that were rejected by the ALJ, Defendant is correct that there is no support for the conclusion that Dr. Rothbaum's lifting, pushing/pulling, and reaching limitations equate with disability. Further, although Plaintiff testified about experiencing neck pain, his testimony does not necessarily equate with disability. "'The DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed, in specific settings...A VE... or other reliable source of occupational information may be able to provide more specific information about jobs or occupations than the DOT.'" (Defendant's XMSJ, p.9 (citing SSR 00-4p)) Thus, further testimony from the VE is required before a disability determination can be made in Plaintiff's case.

Because outstanding issues must be resolved before a determination of disability can

- 40 -

be made, remand for an award of benefits is not warranted.  Nor on this record can it be said that the ALJ's errors were "'inconsequential to the ultimate nondisability determination'" and, thus, harmless.  *Tommasetti,* 2008 WL 2762439, *2 (*quoting Robbins,* 466 F.3d at 885). Instead, the matter should be remanded for further proceedings.

V.      RECOMMENDATION

For the foregoing reasons,  the Magistrate Judge recommends  that the District Court:

(1)     grant in part and deny in part Plaintiff's Motion for Summary Judgment (Doc. No. 20)  The Motion should be granted to the extent that this matter should be remanded for further proceedings.  The Motion should be denied to the extent Plaintiff seeks remand for an immediate payment of benefits;

(2)     deny Defendant's Cross-Motion for Summary Judgment (Doc. No. 30); and

(3)     remand this matter for further proceedings consistent with this Report and Recommendation.

Pursuant to 28 U.S.C. §636(b), any party may serve and file written objections within ten days after being served with a copy of this Report and Recommendation. If objections are filed, the parties should use the following case number: **CV 07-212-TUC-DCB**. A party may respond to another party's objections within ten days after being served with a copy thereof. *See* Fed.R.Civ.P. 72(b).    If objections are not timely filed, then the parties' right to *de novo* review by the District Court may be deemed waived. *See United States v. Reyna-Tapia,* 328 F.3d 1114, 1121 (9th Cir.) (*en banc*), *cert. denied,* 540 U.S. 900 (2003).

DATED this 12th day of August, 2008.

_____

Héctor C. Estrada
United States Magistrate Judge

- 41 -